IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **S.C.** and **B.C.,** individually and as next friends to, **C.C.**, Plaintiffs § § § § | | |
| VS. § § | | |
| **ROUND ROCK INDEPENDENT SCHOOL DISTRICT; THERESA PROCTOR,** individually; and **JOSEPH GRUBBS**, individually, Defendants § § § § § § § | CIVIL ACTION NO.: | 19-1177 |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

To the Honorable Court: S.C. and B.C., individually and as next friends of their daughter, C.C., a minor child, file their original complaint and jury demand complaining of Round Rock Independent School District ("RRISD," herein), Theresa Proctor ("Proctor," herein) individually, and Joseph Grubbs ("Grubbs," herein), individually.

### A. Introduction

1. This is a disability discrimination case brought pursuant to §504 of the Rehabilitation Act of 1973 (42 USC, §794) and Title II of the Americans With Disabilities Act (42 USC, §12131 *et seq*). It is also a 14th Amendment equal protection and due process claim brought pursuant to Title VII of the Civil Rights Act of 1964 as amended (42 USC, §1983).

### B. Parties

2. Plaintiffs are parents of C.C., a minor child who was born in October

2002.  They are residents of the State of Texas and citizens of the United States.

    3.      Defendant, RRISD, is an independent school district organized and existing under the laws of the State of Texas.  Service of process may be delivered to Steve Flores, Ph.D., Superintendent, at 1311 Round Rock Avenue, Round Rock, Texas 78681.

    4.      Theresa Proctor, was, at all times material hereto, a Teacher at McNeil High School within the RRISD. She may be found for service of process at East View High School, 4490 East University Avenue, Georgetown, Texas 78626.

    5.      Joseph Grubbs was, at all times material hereto, acting Assistant Principal for McNeil High School within the RRISD. His present address for service of process is unknown.

## C.  Jurisdiction, Venue, and Conditions Precedent

    6.      This court has federal question jurisdiction to hear this case pursuant to 28 USC, §1331.

    7.      Venue is proper in the Western District of Texas pursuant to 28 USC, §1391, (b), (1) and (2).

    8.      All conditions precedent to filing and maintaining this action, including exhaustion of any applicable administrative remedies, have occurred and have been performed.[1A]

## D.  Relevant Facts

---

[1] Plaintiff filed an administrative complaint with the U.S. Department of Education (DoEd) on July 19, 2019.  That complaint was dismissed on September 27, 2019.  The dismissal notice states, in error, that the complaint was dismissed due to untimely filing, asserting, "You filed this complaint with OCR on August 20, 2019, 209 days after the date the parents first learned of the alleged discrimination."  The complaint, however, was actually filed on July 19, 2019, 177 days after the parents first learned of the school's violations and 3 days before the DoEd deadline.  (See End Note Exhibit "A")

9. C.C. has been a student in RRISD since 2016. She was diagnosed with Anorexia Nervosa the same year. A §504 Plan to accommodate her serious health condition was instituted in January 2017 under authority of the Rehabilitation Act of 1973 (42 USC, §794). C.C.'s troubles, however, grew to a crisis level during her fall 2018 semester at McNeil High School.

### D.1.     Anorexia Nervosa

10. Anorexia Nervosa is an eating disorder characterized by an irrational fear of food as well as extreme, life-threatening weight loss. Patients who suffer from this condition have a distorted body image and an excessive, obsessive fear of obesity, even when they are significantly underweight. Patients with Anorexia Nervosa do not necessarily lose their appetite but rather obsessively control and restrict their food intake.

11. About 5% of people with Anorexia Nervosa die from complications over a ten-year period, a mortality rate nearly 6 times that of the general population.

12. The severe and potentially life-threatening risks associated with Anorexia Nervosa include:

   a. Anemia (iron deficiency);

   b. Compromised immune system (getting sick more often);

   c. Intestinal Problems (abdominal pain, constipation, diarrhea);

   d. Loss or disturbance of menstruation in girls and women;

   e. Increased risk of infertility in men and women;

   f. Kidney failure;

   g. Osteoporosis (fragile and easily fractured bones);

   h. Heart problems (cardiac abnormalities, sudden cardiac arrest); and

   i. Death.

13. In lay terms, the human body, with its innate will to live, will feed itself, even if its owner won't. The anorexic patient's body will begin self-feeding by taking nutrients from the extremities, thus the photos of anorexic patients with bony arms and legs.

14. Once the anorexic body has consumed the nutrients found in the arms and legs, it moves its attention to the internal organs. The heart, of course, is the most nutrient rich internal organ. It is the ultimate focus of the anorexic body's frantic, yet self-destructive quest for food. Once the body commences feeding on the heart for life-sustaining nutrients the heart attack and death will, in the absence of extreme intervention, follow in due course.

### D.2. McNeil High School Fall 2018

15. C.C. transitioned, with her serious health condition, to McNeil High School. Unfortunately, the 504 Plan did not follow her in any meaningful fashion. Assistant Principal Joe Grubbs was assigned to supervise implementation of the Plan, which was to include, among other features, supervised meals. He did not supervise, nor did he delegate supervision. In fact, as later events made clear, he had not even read the plan until C.C. was in full crisis.

16. Journalism instructor, Theresa Proctor was listed as a member of C.C.'s §504 Committee under the plan dated January 2018.  She commented specifically on C.C.'s eating practices:

> "Proctor reports that she eats in her class all the time, and that she eats lunch in there. Proctor is willing to work with Clarissa to send assignments."[B]

Ms. Proctor had more than an ordinary teacher's knowledge of C.C.'s condition and her fragile state of mind.

17. Ms. Proctor recruited C.C. into the journalism department. She succeeded. C.C. enrolled in the journalism program and became involved in the work of the yearbook staff.

18. Ms. Proctor had a plan to exploit C.C.'s health condition. She intended to make C.C. the subject of a feature article in the high school yearbook concerning mental illness. She assigned upper class students to interview and photograph Clarissa with a view to developing the article.

19. As a 16-year old child, C.C. was legally incapable of giving consent to the interviews and photographs. Neither of her parents were contacted by any school official or faculty member to gain consent.

20. Submitting to the peer and faculty pressure, C.C. participated in the interviews and allowed photographs to be taken in late October or early November 2018. Not surprisingly, the photographs and gossipy rumors of Clarissa's condition soon began appearing on internet social media such as Facebook and Instagram.

21. C.C. stopped eating.

22. C.C. is 5 feet, 10 inches tall. The record of her weight as measured and recorded by treating physicians and dieticians tells the story with objective clarity:

| | Date | Weight (in pounds) | Health Care Provider |
|---|---|---|---|
| a. | 8-24-18 | 140 | Dr. Marroquin; |
| b. | 8-27-18 | 144.98 | Tina Laboy, RD; |
| c. | 10-3-18 | 162.8 | Tina Laboy, RD; |
| d. | 10-24-18 | 162.8 | Tina Laboy, RD; |
| e. | 11-24-18 | 159.94 | Adrien Paczosa, RD; |
| f. | 12-7-18 | 148.63 | Dr. Marroquin; |

  g. 01-8-19  134.42  Adrien Paczosa, RD;

  h. 01-17-19  130.02  Adrien Paczosa, RD;

  i. 01-23-19  124.75  Dr. Marroquin; and

  j. 01-30-19  119  Laureate Program.

23. Eventually, C.C. told her parents about the interviews, the photographs, and the upcoming yearbook article. Her father, S.C., met with Mr. Grubbs on January 23, 2019. In that meeting, Grubbs made it clear that he was reading C.C.'s 504 Plan for the first time. Equally clear, the supervised meals requirement had not been satisfied in the fall semester of 2018 at McNeil High School.

24. On January 24, 2019, McNeil High School Principal, Amanda Johnson, telephoned S.C. to apologize. She acknowledged that both Proctor and Grubbs had behaved unprofessionally.

25. As evidenced by her weight gain and loss in the fall semester C.C. went into a psychic and physical tailspin in the late October early November time frame. This coincides with the reported dates of the yearbook staff interviews and photographs. The causal connection between the interviews, photographs, and weight loss is indisputable.

### D.3. Laureate Eating Disorders Program

26. C.C. was admitted to the Laureate Eating Disorders Program in Tulsa, Oklahoma on January 30, 2019 weighing in at 119 pounds, 5 feet 10 inches in height. She told staff at Laureate that she started obsessing with her body after the yearbook interview and photographs. By November she had "crash dieted," couldn't pull herself out of it, and was "scared of food."

27. She reported two motivations for treatment: a 9-day camp at Harvard Medical School in June, and a trip to Peru with her Spanish class in July.

28. C.C. began the Laureate program on January 31, 2019. She was taking Colace for constipation. Her BMI was 15 and her heart rate was abnormally low at 54 bpm. She was treated with Zoloft, a selective serotonin reuptake inhibitor (SSRI), usually prescribed for depression and anxiety.

29. On February 12, she continued to be very distorted about body image, describing herself as the, "fattest one here." She did not see rigidity around food choices as an eating disorder. Her Glucose was low. She only agreed to take Zoloft after learning it was a prerequisite for intermediate privileges, such as yoga. She still did not see a link between rigidity of thinking about food and anxiety. On February 14, she attempted to hide part of her Pop Tart at breakfast.

30. On February 18, she noted her obsessive-compulsive disorder had been higher over the weekend. She continued hiding food. She stated she "feels like I am gaining weight too fast."

31. On February 19 she remained very food focused and unhappy with a dietitian who did not honor her veganism. She was honest and vulnerable, but still struggling when it came to food, comparison, and body image. On February 21, she continued to struggle with meal planning and various behaviors at meals. There were issues in how she interacted with peers and people with eating disorders. She expressed fear of medicines and was disparaging of staff. She was angry about not being vegan. On February 22 she felt like being a "big burden on her family and something to stress about."

32. On February 25, Zoloft was changed to 100 mg. On February 26, she was struggling in conversations with others. She was confronted on her effort in treatment, becoming an adult, and how invested she was in treatment.

33. By March 1, she was noted to be trying harder and working in individual therapy. She was also working in group sessions and thought she was doing, "Ok." But, on March 4, she was struggling, checking on body image, smearing peanut butter, arguing about meal plans, and challenges. On March 7, she expressed worry that she will, "totally not care and eat processed food and ½ jar of peanut butter a day."

34. On March 11, she continued to struggle with selective eating and peanut butter. On March 12 she was struggling with issues of getting fruits that have less calories and working on manipulation with her exchanges around vegetarianism. She was doing emotional work but struggled to properly eat her meal plan, avoid body checking, and behaviors that make it difficult for her to maintain recovery.

35. On March 18, she reported on a family visit over the weekend. It was stressful, especially eating with them. She was overwhelmed at the prospect of going home. She did, however, note it "wasn't as bad as I thought it would be." She was still struggling with motivation.

36. On March 19, she was defensive and made excuses with the dietitian and peers, but not in individual therapy. On March 26 she was very distorted with food, desserts, and issues with "fats," stating, "This causes fat people to get fat." She was working on being more observant of her irrationality and how this impacts others. On March 28, there was more a sense of hope that she can be well and get well. She discussed the definition of recovery and the very real efforts of parents and team to make sure she has a good transition, and the best chance of getting better when she leaves the hospital. Zoloft was increased to 200 mg.

37. On April 2, she was annoyed at interactions with Mother and Sister. On April 8 she discussed issues around her weight and stated she was being honest. She

believed her metabolism was broken. She was working differently than in the past, on advanced level issues. She continued Zoloft without side effects.

38. On April 12, there were issues with getting cheese, proteins over time, and Greek yogurt. She was doing some advanced work but could still fall-down with honesty and food issues.

39. During April 18-22 she was working with Mother who was very anxious but sweet and asked a lot of questions during meal planning. C.C. made big claims about what Mother does to food and had to be redirected. She noted that parents were talking more about what she was missing out on when she is sick or not connected, something they had protected her from in the past. She noted that things do go better with parents when she is doing better. She still worried that if she isn't vigilant weight will go up and she will be out of control.

40. On April 23, she was still trying to simplify her meal plan, worried she would lose control and gain weight like before. It was noted she wasn't doing her meal plan and wasn't being honest. The importance of the consistency of food and trust in the meal plan was stressed. Her anxiety was still being played out in food. She was required to eat a non-vegan item at every meal.

41. She was discharged from in-patient care on April 25, 2019 due to lack of funding.

### D.4. Hostile Environment at McNeil High School

42. In late April 2019 C.C. returned to her classes at McNeil High School and was subjected to a hostile environment. The hostility stemmed from gossip and rumors that the journalism teacher had been terminated over spring break because C.C.'s family, "Was suing the school." School officials were advised that the hostile environment would

be considered an element of the family's damages.

### D.5.  Summary

43.     Before the fall 2018 semester, with the help of her parents and health care providers, C.C. had turned a corner. She was back in school for her sophomore year, rejoining her friends in active teen-aged life, and continuing her education. She was doted on and over by the journalism teacher and basked in the warm attentions of upper-class students in the Journalism Department. She was living life to the full.

44.     Theresa Proctor, however, had a different idea. She saw in Clarissa an opportunity for exploitation. She succeeded in luring this vulnerable young person into her sphere of influence. She instructed older students, whom Clarissa evidently admired to interview her about intimate private health issues, and to allow herself to be photographed for display in the high school yearbook.

45.     Ms. Proctor never bothered to ask for the parents' permission. A reasonable person may suspect that she knew, in her heart of hearts that the parents, who had been fighting their daughter's deadly disease for years, would refuse. Nevertheless, she proceeded in her quest for a feature story in the yearbook with a blind eye to the extreme risk and actual harm to which she exposed a vulnerable child entrusted to her care by her parents under our state's compulsory school attendance laws.

46.     Joseph Grubbs never bothered to read the 504 Plan.  He, too, proceeded with a blind eye, in reckless indifference to the risk of and actual damage caused by his conduct.

### D.6.  Medical Bills & Personal Injuries

47.     Treatment at Laureate is expensive. Medical or hospital bills have been paid or incurred as follows:

      a.  01/30/19 – 03/15/19, Hospital Charges $ 96,271.59 [C]

      b.  01/30/19 -- 03/15/19, Professional Charges $ 5,844.00[D]

      c.  03/15/19 – 04/15/19, Hospital Charges $ 47,639.34[E]

      d.  03/15/19 – 04/15/19, Professional Charges $ 2,538.00[F]

      e.  03/15/19 – 03/31/19, Hospital Charges $ 1,360.00[G]

      f.  04/15/19 – 04/24/19, Hospital Charges $ 1,120.00[H]

      g.  04/15/19 – 04/24/19, Professional Charges $ 994.00[I]

      h.  04/15/19 – 04/24/19, Hospital Charges $ 10,267.00[J]

48.    In addition to the extreme financial burden of their eldest daughter's hospitalization, C.C.'s family has suffered severe and sustained emotional and economic distress. Both parents have spent countless sleepless nights, have been and are distracted from the needs of C.C.'s little sister, and the demands of their jobs. They have suffered and will continue to suffer mental anguish that interferes with the daily routine of their lives, and injury to their earning capacity.  C.C. has suffered a life-threatening condition involving physical pain, mental anguish, and emotional distress.  It is reasonably foreseeable that as she comes of age, Defendants' conduct will be seen as responsible for injury to her earning capacity.

### E.  Legal Principles & Causes of Action

49.    C.C. was entitled, under the provisions of §504 of the Rehabilitation Act of 1973, Title II of the ADA, and the 14th Amendment to be free from the life threatening bodily and psychologic injuries, intrusions, and offenses committed by Ms. Proctor and Mr. Grubbs. Both were certified professional educators, who should have known better.

50.    C.C. was also entitled to RRISD's institutional protection from the willful and reckless conduct of its employees.  Both the school district and its professional educator

employees willfully turned a blind eye to her distress.

51.    Defendants' acts and omissions described in this complaint were a direct, proximate, and producing cause of Plaintiffs' injuries and legal damages complained of herein.

### E.1.  Rehabilitation Act, §504

52.    Plaintiffs make claims for damages and statutory relief, including attorney fees pursuant to §504 of the Rehabilitation Act of 1973 (42 USC, §794).

### E.2. Title II of the Americans With Disabilities Act

53.     Plaintiffs make claims for damages and statutory relief, relief, including attorney fees pursuant to Title II of the Americans With Disabilities Act (42 USC, §12131 *et seq*).

### E.3. Equal Protection & Due Process, Title VII of the Civil Rights Act of 1964

54.    Plaintiffs also make claims for damages and statutory relief, including attorney fees pursuant to the due process and equal protection clauses of the 5th Amendment as applied to the states through 14th Amendment, and assert their private rights of action pursuant to Title VII of the Civil Rights Act of 1964 as amended (42 USC, §1983).

### E.4.  Joint & Several Liability

55.    Defendants are jointly and severally liable.

### F.   Jury Demand

56.    Plaintiffs demand a trial by jury.

### G.  Prayer

57.    Premises considered, Plaintiffs pray that Defendants be cited to appear and answer herein, in the terms of the law, that upon final hearing they have judgment of and

from Defendants, jointly and severally, for the full amount of their damages as found by the jury, reasonable and necessary attorney fees as found by the court, and for such other and further relief as the court may deem proper.

        Respectfully Submitted,



THE COMMISSIONERS HOUSE AT HERITAGE SQUARE
2901 Bee Cave Road, Box L
Austin, Texas 78746
Phone: (512) 328-9099
Facsimile No. (512) 328-4132
Email: jjudge@jkplaw.com
ATTORNEYS FOR PLAINTIFF

_____
John Judge
State bar no. 11044500

---

[A] C-000199-207
[B] C-000006-12
[C] C-000157-172
[D] C-000173-174
[E] C-000176-178
[F] C-000179
[G] C-000175
[H] C-000180
[I] C-000182
[J] C-000181